UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JANICE GALE SILVA,<br><br>        Plaintiff,<br><br>  v.<br><br>MICHAEL J. ASTRUE, Commissioner of Social Security,<br><br>        Defendant. | CASE NO.    C08-5487FDB-KLS<br><br>REPORT AND RECOMMENDATION<br><br>Noted for June 12, 2009 |

Plaintiff, Janice Gale Silva, has brought this matter for judicial review of the denial of her application for disability insurance benefits. This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule MJR 4(a)(4) and as authorized by <u>Mathews, Secretary of H.E.W. v. Weber</u>, 423 U.S. 261 (1976). After reviewing the parties' briefs and the remaining record, the undersigned submits the following Report and Recommendation for the Court's review.

<u>FACTUAL AND PROCEDURAL HISTORY</u>

Plaintiff currently is 59 years old.[1] Tr. 43. She has a college education and past work experience as

---

[1] Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

REPORT AND RECOMMENDATION
Page - 1

a broadcast sale representative. Tr. 32, 81, 83.

On June 16, 2005, plaintiff filed an application for disability insurance benefits, alleging disability as of September 30, 1981, due to amputation of the left leg above the knee as the result of a bone tumor and severe phantom pain. Tr. 26, 70-72, 76. Her application was denied initially and on reconsideration. Tr. 26, 43, 45, 58. A hearing was held before an administrative law judge ("ALJ") on October 18, 2007, at which plaintiff, represented by counsel, appeared and testified, as did a vocational expert. Tr. 378-96.

On December 20, 2007, the ALJ issued a decision, determining plaintiff to be not disabled, finding specifically in relevant part:

> (1) at step one of the sequential disability evaluation process,[2] plaintiff had not engaged in substantial gainful activity since her alleged onset date of disability through her date last insured, March 31, 1986;
>
> (2) at step two, through her date last insured, plaintiff had a "severe" impairment consisting of above the knee amputation of the left lower extremity;
>
> (3) at step three, through her date last insured, plaintiff did not have an impairment or combination of impairments that met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;
>
> (4) after step three but before step four, through her date last insured, plaintiff had the residual functional capacity to perform a modified range of sedentary work;
>
> (5) at step four, through her date last insured, plaintiff was unable to perform her past relevant work; and
>
> (6) at step five, through her date last insured, plaintiff was capable of performing other jobs existing in significant numbers in the national economy.

Tr. 26-33. Plaintiff's request for review was denied by the Appeals Council on May 29, 2008, making the ALJ's decision the Commissioner's final decision. Tr. 5; 20 C.F.R. § 404.981.

On August 4, 2008, plaintiff filed a complaint in this Court seeking review of the ALJ's decision. (Dkt. #1). The administrative record was filed with the Court on November 26, 2008. (Dkt. #8). Plaintiff argues the ALJ's decision should be reversed and remanded for further administrative proceedings for the following reasons:

> (a) the Appeals Council erred in rejecting new evidence from plaintiff's treating physician and in failing to consider other additional evidence submitted to it for the first time;

---

[2]The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920. If the claimant is found disabled or not disabled at any particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id.

REPORT AND RECOMMENDATION
Page - 2

|   |     |                                                                                  |
|---|-----|----------------------------------------------------------------------------------|
|   | (b) | the ALJ failed to properly evaluate plaintiff's phantom pain in determining her employability; and |
|   | (c) | the ALJ improperly discounted plaintiff's credibility.                           |

For the reasons set forth below, the undersigned does not agree that the ALJ erred in determining plaintiff to be not disabled, and therefore recommends that the ALJ's decision be affirmed.

## DISCUSSION

This Court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the Court must uphold the Commissioner's decision. Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

### I. Plaintiff's Date Last Insured

To be entitled to disability insurance benefits, plaintiff "must establish that her disability existed on or before" the date his insured status expired. Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998); see also Flaten v. Secretary of Health & Human Services, 44 F.3d 1453, 1460 (9th Cir. 1995) (social security statutory scheme requires disability to be continuously disabling from time of onset during insured status to time of application for benefits, if individual applies for benefits for current disability after expiration of insured status). As noted by the ALJ, plaintiff's date last insured was March 31, 1986. Tr. 43. Therefore, to be entitled to disability insurance benefits, plaintiff must establish she was disabled prior to or as of that date. Tidwell, 161 F.3d at 601. As discussed below, however, she has failed to do so.

### II. Evidence Submitted to the Appeals Council

The record contains a letter, dated April 22, 2008, to plaintiff's attorney from Ernest U. Conrad III, M.D., plaintiff's treating orthopedist, which was submitted to the Appeals Council some four months after the ALJ had issued his decision. See Tr. 377. That letter reads in relevant part:

REPORT AND RECOMMENDATION
Page - 3

Please find my answers to your questions of February 22, 2008.

**1)** **Do you recall Ms. Silva having complaints of fatigue from the use of prosthesis over the years from when you first saw her?**
I do not recall, but all above knee amputees have some level of fatigue. So the answer is affirmative

**2)** **Do you recall Ms. Silva having complaints of phantom pain over the years from when you first saw her?**
Yes, I do.

**3)** **Are these complaints consistent with the nature and extent of her amputation?**
Yes.

**4)** **If the answer to 1 and 2 are affirmative, I would assume her problems more probably preceded your first contact with Ms. Silva?**
Yes[.]

Id. (emphasis in original). In its decision denying plaintiff's request for review of the ALJ's decision, the Appeals Council addressed the statements contained in Dr. Conrad's letter as follows:

> The Appeals Council has considered the letter from Ernest Conrad III, M.D., addressing four questions regarding the claimant's complaints of fatigue and pain. However, it is not clear from this letter, that Dr. Conrad remembers the specific details he is being asked to recall 20 years after treatment. This information does not warrant a change in the Administrative Law Judge's decision. The Administrative Law Judge's decision is supported by the weight of the evidence.

Tr. 6. Plaintiff argues the Appeals Council erred in rejecting Dr. Conrad's letter, because it was material to the issue of the existence of her phantom pain, and thus, for that reason, this matter should be remanded for further consideration of that evidence. The undersigned disagrees.

Defendant argues this Court has no jurisdiction to review the Appeals Council's denial of plaintiff's request for review. See Mathews v. Apfel, 239 F.3d 589, 594 (3rd Cir. 2001) (noting no statutory authority, source of district court's review authority, authorizes district court to review Appeals Council decisions to deny review). Because no federal court jurisdiction exists, defendant asserts this Court's review of new evidence submitted to the Appeals Council is governed by the requirements of sentence six of 42 U.S.C. § 405(g). Sentence six provides in relevant part that the Court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g).

Plaintiff does not contest the Court's lack of authority to review the Appeals Council's decision to

deny review in this case, and, indeed, as noted above, it has none. Nor does plaintiff challenge defendant's assertion that to justify remand for further consideration of the statements in Dr. Conrad's letter, plaintiff must show that evidence to have been both new and material, and that there was good cause for her failure to submit it earlier. As such, the undersigned shall apply that standard in determining whether remand to consider the evidence contained in Dr. Conrad's letter is appropriate.

Under the standard set forth in 42 U.S.C. § 405(g), to justify remand here, plaintiff must show that the additional evidence contained in Dr. Conrad's letter is "new" and "material" to determining disability, and that she "had good cause for having failed to produce that evidence earlier." Mayes v. Massanari, 276 F.3d 453, 462 (9th Cir. 2001). To be material under 42 U.S.C. § 405(g), that evidence "must bear 'directly and substantially on the matter in dispute.'" Id. (citation omitted). In addition, plaintiff must demonstrate a "reasonable possibility" the statements set forth in Dr. Conrad's letter "would have changed the outcome of the administrative hearing." Id. (citation omitted). To demonstrate "good cause," plaintiff must show those statements were "unavailable earlier." Id. at 463. The good cause requirement will not be met by "merely obtaining a more favorable report" following denial of plaintiff's disability claim. Id.

Although the statements contained in Dr. Conrad's letter are new in that they were provided after the ALJ issued his decision, and are arguably material in that they do bear directly and – albeit not without at least some question – substantially on the issue of the existence of plaintiff's alleged phantom pain prior to or as of her date last insured, good cause has not been shown here. That is, plaintiff has failed to provide any explanation as to why Dr. Conrad's statements could not have been presented earlier to the ALJ before the decision denying disability benefits was issued. Indeed, the record shows Dr. Conrad had been treating plaintiff since at least 1988. See Tr. 242. As noted above, furthermore, "good cause" will not be found to have been established by merely obtaining a more favorable medical source opinion after her application for disability benefits already had been denied, as appears to be the case here.

Plaintiff also argues the Appeals Council erred in failing to consider a statement of her ex-husband, which was submitted for the first time after the denial of her disability claim as well. In that statement, the ex-husband describes what he observed concerning plaintiff's phantom pain subsequent to the amputation, including between the years of 1981 and 1986. See (Dkt. #11-2, Exhibit A). Again, however, although the statements provided by plaintiff's ex-husband are new, and while they do appear to bear both directly and

substantially on the issue of the nature and timing of her alleged phantom pain, no "good cause" has been shown to justify remand of this matter on the basis of that evidence. That is, plaintiff has not provided any explanation as to why she could not have submitted her ex-husband's letter earlier. The undersigned thus declines to remand this matter in light of that letter or the one written by Dr. Conrad.

III. The ALJ's Evaluation of Plaintiff's Phantom Pain

Plaintiff argues the ALJ failed to properly evaluate her complaints of phantom pain. Specifically, she asserts the ALJ improperly discounted those complaints in stating that Douglas Pritchard, M.D., had noted that her "phantom leg pains had finally resolved by June of 1978." Tr. 31. The ALJ's reliance on Dr. Pritchard's comment here, plaintiff goes on to argue, was improper, because that comment is ambiguous at best and is contradicted by the letters from Dr. Conrad and her ex-husband. In regard to the latter point, as discussed above, the evidence provided by Dr. Conrad and plaintiff's ex-husband is not properly before the Court, and therefore will not be considered here. In addition, the ALJ cannot be faulted for having failed to consider evidence that was not before him. As to the former point, the undersigned finds that the comment Dr. Pritchard made is hardly ambiguous.

In defense of her argument, plaintiff states that Dr. Pritchard's comment is not probative of whether her phantom leg pain returned sporadically. But the evidence that is properly in the record before the Court fails to show the existence of phantom pain – sporadic or otherwise – during the relevant time period, but rather overwhelmingly shows that any such pain had resolved well before the date plaintiff's insured status had expired. In early June 1978, for example, Dr. Pritchard stated that plaintiff was "getting along very well with no new medical problems," and that, as noted by the ALJ, her phantom pain had "finally resolved." Tr. 126. In early October 1978, Dr. Pritchard reported that plaintiff was "doing very well." Id. In early April 1979, he again reported that she had "been getting along very well," with "no new problems," that she had been "very active," and that she was "even playing tennis with her above the knee prosthesis." Id. Substantially the same findings were made in mid-October 1979, as well. Id.

In early February 1981, another of plaintiff's treating physicians at the time, Theodore K. Greenlee, Jr., M.D., found that she had "really quite an excellent gait," with no complaint of "any particular problems with her prosthesis" or otherwise. Tr. 136-37. In late December 1981, Dr. Greenlee wrote a letter in which he stated that plaintiff was "doing very well in her limb," with her left stump also noted to

be "in excellent condition." Tr. 241. In early March 1983, Dr. Greenlee stated that she was "actually doing extremely well with her amputation," and that she was "having no problem with her stump." Tr. 239. Then again in mid-March 1984, Dr. Greenlee wrote that plaintiff seemed "to be doing very nicely with her amputation," and that, once more, she had "no problems with her stump." Tr. 238. In early April 1985, plaintiff was found by Dr. Greenlee to have "no problems at all" (Tr. 237, 243), and in early May 1985, Dr. Pritchard noted her to be "getting along very well." Tr. 236.

The next medical report dates from early May 1987, when another of plaintiff's treating physicians, Nancy Ensley, M.D., found her to be "presently doing quite well," stating further that she denied having "any other systemic signs or symptoms," and that she would now have to be followed "at yearly intervals" only. Tr. 230, 234. In mid-May 1988, Dr. Conrad found plaintiff had "minimal stump tenderness," noting also that she was "doing quite well." Tr. 228, 242. As such, the evidence in the record establishes that well through her date last insured, plaintiff was doing very well following her amputation to say the least, with no reports of phantom pain or other significant problems since prior to early June 1978.

Indeed, in early August 1989, Dr. Conrad described plaintiff as "doing well more than 11 years out" from her diagnosis and amputation, with "no residual limb problems." Tr. 226. The record is sparse for the period between early August 1989, and early May 1996, at which time plaintiff reported that she "began to experience some phantom pain" approximately three weeks earlier, but which lasted for only about a week. Tr. 208. In late June 1999, plaintiff was noted to be "currently without complaint" and "doing well," other than with respect to a need for further evaluation due to complaints of her prosthesis "not fitting correctly." Tr. 207. After being prescribed a new prosthesis, plaintiff was asked to return in one year for a follow-up. <u>Id.</u> In October 1999, she was seen again, and was noted to probably have "just normal wear-and-tear of her above-knee amputation site" which was causing some pain in her stump. Tr. 201-06.

By late October 1999, however, plaintiff was found to have "no tenderness," with "good range of motion in her hip without any significant pain." Tr. 199. In late November 1999, she reported that her pain was "very well under control," and "no area of increased tenderness" or any other significant problem was found. Tr. 200. She continued to do well in late January 2000. Tr. 198. In late June 2001, plaintiff stated that she took "no pain medications other than ibuprofen," that she was "very active," both with respect to

1  "walking four miles per day" and playing tennis. Tr. 195. Again she was continuing to be seen only on a
2  yearly basis. Id. Although due to some issues of adjusting to the new prosthesis she had re-fitted in August
3  2000, plaintiff reported dropping "down to two miles per day of walking," she further reported being "very
4  active with tennis," including participating "in tournaments this past year." Tr. 194.

5  Plaintiff continued to be "doing very well" functionally in late June 2003, having no prosthesis or
6  stump problems, and walking "up to three miles a day." Tr. 193. In early March 2004, plaintiff reported
7  engaging in "[r]egular exercise with walking and swimming, tennis." Tr. 166. In early April 2004, she was
8  noted to be able to weed for one to two and a half hours at a time. Tr. 164. In early August 2005, plaintiff
9  reported having "[n]o particular pain in the body anywhere." Tr. 182. The record, therefore, clearly shows
10 that she has functioned extremely well both since prior to the date her insured status expired, and for a
11 long period of time thereafter, with no on-going reports of significant pain, phantom or otherwise.

12 The record does contain a letter, dated January 3, 2006, from Davonna Cufley, M.D., another of
13 plaintiff's treating physicians, who stated therein that plaintiff reported it took her "65% more energy to
14 operate her left leg prosthesis," which caused "a need for two major rest periods daily of 1-2 hours each."
15 Tr. 184. Plaintiff further told Dr. Cufley at the time, that "all of these issues" prevented her from "working
16 substantially in that she could not possibly work a full-time job." Id.; see also Tr. 327. Clearly, however,
17 this opinion is based primarily on reporting provided by plaintiff herself – whose credibility, as discussed
18 in greater detail below, the ALJ did not err in discounting – focuses solely on her current condition at that
19 time, and makes no mention of phantom leg pain. In mid-February 2006, plaintiff did report experiencing
20 "phantom pain into the left leg, at times," and was noted to walk with a "slight limp due to the prosthesis."
21 Tr. 325-26. Again, though, that report concerned her present condition, and gave no indication of plaintiff
22 having had that pain since the period prior to or as of her date last insured.

23 In early April 2006, furthermore, plaintiff reported that "[t]hroughout the day," she was
24 "independent without the use of crutches or other aids for mobilizing." Tr. 342. She also was described as
25 being "a long-term" amputee, who had been "well adapted and high functioning in her prosthesis." Tr.
26 343. In addition, plaintiff was "walking up to 4 miles at a time," she had "no stump" or other
27 musculoskeletal problems, and her left leg had "good strength." Tr. 344. While Dr. Conrad felt she
28 currently was "mildly or moderately disabled" by her amputation in late August 2006, he made no mention

of phantom pain, nor did he give any opinion as to her condition prior to or as of her date last insured. Tr. 190.

There is an early January 2007 report of "phantom pain in left leg, exacerbated by stress" (Tr. 354), but this appears to have been plaintiff's only such report in nearly a year, and, again, that report does not relate back to the relevant time period under consideration here. Kim Leatham, M.D., yet another treating physician, did opine in late August and early September 2007, that plaintiff was debilitated and disabled "by her experience with the amputation and prosthesis" – including experiencing both chronic fatigue and the need to expend extra energy (Tr. 347, 372) – but, once more, those opinions lack any indication these symptoms had been continuously present since her date last insured.

Lastly, the record contains a letter, dated October 7, 2007, in which Dr. Leatham writes:

> This is regarding Ms. Janice Silva's disability due to an above-the-knee amputation in 1978. As a result of that operation and subsequent limitations it placed on her abilities, she suffered fatigue with [sic] made her unable to work. This fatigue became evident soon after her recovery from surgery and rehabilitation period, and has persisted.
>
> Compensating for her amputated leg requires a lot of postural energy and extra work of the right hip and legs as her dominant support. She has had to take naps since 1982.
>
> Based on available history, it is my opinion that fatigue has been present since this date.

Tr. 373. But Dr. Leatham provides no opinion nor does she point to any findings regarding the presence of phantom pain, either prior to or after plaintiff's date last insured. In addition, as noted by the ALJ, Dr. Leatham was not plaintiff's treating physician during that time period, had "no grounds on which to base an opinion" of plaintiff's condition prior to when she began treating plaintiff in August 2005 – other than plaintiff's own self-reports thereof – and her opinion is "not consistent with the medical evidence" in the record for that period, which shows plaintiff was "quite mobile and functional." Tr. 31.

IV.     The ALJ's Assessment of Plaintiff's Credibility

Questions of credibility are solely within the control of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). The Court should not "second-guess" this credibility determination. Allen, 749 F.2d at 580. In addition, the Court may not reverse a credibility determination where that determination is based on contradictory or ambiguous evidence. Id. at 579. That some of the reasons for discrediting a claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long as that determination is supported by substantial evidence. Tonapetyan v. Halter, 242 F.3d 1144, 1148

(9th Cir. 2001).

To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the disbelief." Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted). The ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." Id.; Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). Unless affirmative evidence shows the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." Lester, 81 F.2d at 834. The evidence as a whole must support a finding of malingering. O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996). The ALJ also may consider a claimant's work record and observations of physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms. Id.

Here, the ALJ discounted plaintiff's credibility for the following reasons:

> The claimant testified that following the amputation, she had difficulty doing any physical activities. Since 1982, she has required at least two rest period [sic] per day that could last anywhere from 45 minutes to two or three hours. This fatigue is primarily caused by using the heavy prosthetic device. However, during the same time period she also testified to doing activities that are not entirely consistent with the reported severity of her impairment. She testified that she can walk four to six blocks before needing to rest, and sometimes even longer. When the claimant was encouraged to exercise and resume regular activities by her treating physicians, she was able to play tennis with her above the knee prosthesis. In addition, I note that the claimant adopted and raised a child during the relevant time period.

Tr. 30. Plaintiff takes exception to these findings. Specifically, she asserts the above activities are not inconsistent with her alleged need to take rest breaks during the day and the sudden onset of phantom pain she claims to experience. Plaintiff further argues that the statements from her treating physicians the ALJ relied on to find she was healthy, doing well, being more active, and having few, if any, difficulties in the use of her prosthesis, are ambiguous at best.

The Court shall deal with the last argument first. In support of that argument, plaintiff claims that she can find no opinions in the record wherein Dr. Greenlee and Dr. Pritchard found she had few physical limitations as stated by the ALJ, or any indication that those two physicians evaluated any of her physical limitations. However, the Court finds this argument wholly unpersuasive. What the ALJ actually stated

REPORT AND RECOMMENDATION
Page - 10

was that "[t]he opinions expressed by Drs. Greenlee and Pritchard that" she "had few physical limitations" were "supported by the objective medical record." Tr. 31. Plaintiff takes the ALJ's meaning here literally. It is true that neither physician used those specific words. As discussed above, though, they repeatedly did note that plaintiff appeared to get along very well and be active, without any problems stemming from her use of the prosthesis. Virtually all the objective medical evidence in the record, furthermore, supports the findings of both the ALJ and the two physicians here.

The fact that the progress notes and reports provided by Dr. Greenlee and Dr. Pritchard contain no detailed summary of their evaluations of plaintiff also is of little consequence in this case. This is because neither their notes and reports, nor those of any of the other medical opinion source in the record, contains any objective medical or clinical findings indicating the presence of more significant limitations during the relevant time period. Because plaintiff has the burden of proof at steps one through four of the sequential disability evaluation process (See Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999)), she must do more than just assert the medical findings and opinions of her treating physicians are unsupported. Rather she must come forth with or point to evidence in the record that such is actually the case.[3]

In terms of plaintiff's allegations of experiencing debilitating or disabling phantom pain, again, as discussed above, the medical and other evidence in the record simply does not support such symptoms and limitations during the relevant time period. Nor, also as discussed above, does the record support a finding that plaintiff's infrequent complaints of such pain, which occurred long after her insured status already had expired, related continuously back to that period as required to establish disability in this case. In addition, the Court finds the substantial evidence in the record supports the ALJ's evaluation of plaintiff's activities and the adverse impact those activities have on her credibility.

To determine whether plaintiff's symptom testimony is credible, the ALJ may consider her daily activities. Smolen, 80 F.3d at 1284. Such testimony may be rejected if she "is able to spend a substantial part of his or her day performing household chores or other activities that are transferable to a work

---

[3]The undersigned also does not take well plaintiff's assertion that the statements made by Dr. Greenlee and Dr. Pritchard that she was "doing well" are unacceptably ambiguous. Plaintiff asserts it is impossible to tell exactly what they mean by those words. There is nothing in their notes or reports, however, to indicate any meaning should be given to those words other than that traditional applied thereto. That is, given that, as discussed above, nothing in the way of significant physical limitations – other than the fact, of course, of the need to employ the use of the prosesthis itself – were found during the relevant time period either by them or any other medical opinion source, "doing well" should be taken to mean just that, doing well in terms of her ability to function physically overall.

REPORT AND RECOMMENDATION
Page - 11

1  setting." Id. at 1284 n.7. Plaintiff need not be "utterly incapacitated" to be eligible for disability benefits,
2  however, and "many home activities may not be easily transferable to a work environment." Id. In this
3  case, plaintiff's testimony at the hearing notwithstanding, the record overall shows she engaged in a level
4  of activity inconsistent with her claims of inability.

5  The undersigned agrees that the ability to walk only four to six blocks without needing to rest does
6  not alone necessarily call into question plaintiff's alleged need to take one or more rest breaks during the
7  day of varying lengths. As discussed above, however, plaintiff has consistently reported to her treatment
8  providers over time, including most recently, an ability to walk up to several miles per day. See Tr. 192
9  ("can walk up to 2 to 3 miles at one time"), Tr. 193 ("can walk up to three miles a day"), 194 ("two miles
10 per day of walking"), 195 ("walking four miles per day"), 196 ("walking one and one-half miles per day"),
11 197 ("walking one mile a day"); 344 ("walking up to 4 miles at a time").

12 The record also shows plaintiff has been much more active in regard the other physical activities
13 she engages in, including tennis, than she now alleges as well. See Tr. 126 ("very active"), 164 (being able
14 to weed for one to two and one half hours), 195 ("very active"; "active with tennis"), 194 ("very active
15 with tennis and has participated in tournaments this past year"), 196-97, 208 ("quite active recreationally,
16 even playing tennis"). Plaintiff also takes issue with the ALJ noting that she adopted and raised a child.
17 But the undersigned finds no error here, given that being responsible for raising an infant and small child
18 requires the ability to engage in physical activities at a level often at odds with an allegation of inability to
19 perform any work. In any event, there is no indication in the record that plaintiff was significantly limited
20 in her ability to care for her child during the relevant time period. Indeed, the evidence appears to show
21 the contrary, as in early May 1996, for example, plaintiff reported being "quite active a a mother of a 10-
22 year old child." Tr. 208. Accordingly, the undersigned finds no error here.

23                                            CONCLUSION

24 Based on the foregoing discussion, the Court should find the ALJ properly concluded plaintiff was
25 not disabled, and should affirm the ALJ's decision.

26 Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b),
27 the parties shall have ten (10) days from service of this Report and Recommendation to file written
28 objections thereto. See also Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those

objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **June 12, 2009**, as noted in the caption.

DATED this 20th day of May, 2009.

Karen L. Strombom
United States Magistrate Judge